## Case No. 2,159.

### The BURKE.

### The BURKE v. HURNEY.

### The GLIDE v. SAME.

[4 Cliff. 582.][1]

Circuit Court, D. Massachusetts. May Term, 1878.

ADMIRALTY PRACTICE — CONSOLIDATION OF ACTIONS—COLLISION—DIVISION OF DAMAGES.

1. Actions pending in a federal court, whether two or more of like nature, or relative to the same question, may be consolidated if the court

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

deems it reasonable, in order to avoid unnecessary costs, or to prevent delay.

[See Keep v. Indianapolis & St. L. R. Co., 10 Fed. 454; Holmes v. Sheridan, Case No. 6,644; Durant v. Washington County, Id. 4,191.]

2. In each of the two cases a schooner had discharged her cargo, and had come to anchor near a sea-wall, probably within the sweep of the mooring-chains of a powder-boat; there was a fresh breeze, and the schooner in each case became entangled in the mooring-chain of the powder-boat, that is, the chain of the powder-boat got between the rudder and the stern-post of the schooner. The schooner had no anchor-watch. The tug went alongside, made fast to the schooner without authority, and commenced hauling upon her while she was caught between the rudder and stern-post as above stated. Injury was inflicted upon the schooner by this attempt of the tug. Held, that both vessels were in fault, and that the damages should be divided.

[Appeal from the district court of the United States for the district of Massachusetts.

[In admiralty. Libels by John Hurney, owner of the schooner Alpine, against the steam-tug Burke (Seth G. Rogers et al., claimants), and by the same against the steam-tug Glide, for damages caused by collision. There was a decree in the district court (case not reported) for libellant, and the claimants of the tugs appealed. Affirmed.]

C. G. Thomas, for libellant.

Libellant's schooner Alpine was one of the numerous vessels employed in freighting stone for construction of the state sea-wall in Boston harbor. On or about Oct. 16, 1876, the morning of the collision, the Alpine had discharged her cargo, and hauled out of the dock and dropped her two anchors under the lee of the wall, leaving sufficient space for the next vessel in her turn to pass into the berth vacated by her. While thus lying at anchor under the eyes and control of her master and crew, who were engaged in putting stores and provisions aboard for another trip, at about noon, and about full tide, the cable or mooring-chain of the powder-boat Fawn, for a long time kept anchored in that vicinity for deposits of powder, and within the distance from shore prohibited by the city ordinances (1876, p. 346, § 5), with nobody ever aboard, except on occasions required for the delivery of powder by the powder company, swept around as borne by the tide from her mooring-post or anchor, and caught her mooring-chain between the rudder and stern-post of the Alpine, there lying in the same place she took when hauled out of the dock that morning. The Alpine had both her anchors down, so that the powder-boat could not drag her but was held fast until subsequently, on the arrival of the steam-tug Burke, when one of her anchors' cable was cut. While thus held, though in no immediate danger so long as the wind blew off shore, leaving smooth water under the lee of the wall, the Alpine's captain or

agent and crew were preparing to clear the powder-boat's chain from the Alpine by running a line from the sea-wall or fastening-post to the powder-boat, and procuring a slack of the powder-boat's chain, which was kept constantly taut by the ebb of the tide, when the steam-tug Burke steamed up and seized hold of the Alpine, made fast to her, forward, and commenced hauling and trying to swing her from larboard to starboard. At the same time they were forbidden to meddle with the Alpine. Not heeding this, and being unable to swing or drag the Alpine while her two anchors were down, to attain their purpose, they cut the port anchor's cable, and thus enabled the tug to swing the Alpine from larboard to starboard till they pulled out the deadwood, which in this vessel formed part of the frame, so as to let the water into her hull, whereby the vessel was cleared, and soon afterwards sank a short distance from the powder-boat. If, instead of first taking hold of the Alpine, which was stationary and immovable, they had taken hold of the powder-boat and got a slack in the powder-boat's chain, which was held taut by the ebb tide, by hauling her towards the Alpine, then the chain would have dropped from between the Alpine's rudder and stern-post by its own weight. His honor, Judge Lowell, held it to be an imperative duty on the part of the tug to have first notified the owners of the Alpine, and given them an opportunity to extricate their own vessel; that if without any authority they took possession of the Alpine, and undertook to extricate her, they took the risk, and made themselves liable for all damages resulting. Neglect to have anchor-watch not a fault, unless the fact contributes to the collision. The Lincoln [Case No. 8,354]. Where one vessel drives upon another which is at anchor in a proper position, the presumption is that the former is in fault. The Lincoln [supra].

A. D. Chandler, for claimants.

The Alpine, while anchored at a poor anchorage, without any person on board, in close proximity to other vessels, was exposed to a high wind from off shore, dragged her anchor, and would have gone down the harbor had she not collided and become entangled with the powder-boat Fawn, which was permanently moored in a place she was entitled to occupy. It is elementary that under such circumstances the Alpine was presumably at fault (she was found to be so by the court below), and that the libel should be dismissed. 1 Pars. Shipp. 573; The Lion [Case No. 8,379]; The Granite State, 3 Wall. [70 U. S.] 310, 313; The Clarita and The Clara, 23 Wall. [90 U. S.] 1, 14; The Lincoln [supra]; The Lady Franklin [Case No. 7,984]. It is indisputable that the proximate cause of this collision was the absence of the Alpine's captain and crew, and it is equally beyond question that up to the time of the arrival of the tug Burke, neither the powder-boat (which is not libelled) nor the tug (for it had not yet touched the Alpine) had contributed to the collision. So far, then, the application of the familiar division rule in determining the liability for damages is forbidden by the authorities. The division rule cannot be applied unless both vessels have contributed to the collision. Ralston v. The State Rights [Case No. 11,540]; Wilson v. The Envoy [Id. 7,802]; The Alhambra [Id. 192]; Ward v. The M. Dousman [Id. 17,153]. The two in collision, it was now the duty of the powder-boat, which was not disabled, to render all possible assistance to the abandoned Alpine, though the Alpine was in fault. 1 Pars. Shipp. 529, and cases cited; The Clarita and The Clara, 23 Wall. [90 U. S.] 1, 18. This assistance was at once brought and carefully tendered; and because of the extension of this civility, of the performance of this duty, the vessel aided has the assurance to libel the party to whom it is in truth indebted. To be sure, if the aid so tendered had been accompanied by gross carelessness, there might be an excuse for the injured party in seeking reparation. But no wanton injury was done the Alpine; no harm at all was done the Alpine in extricating her, beyond a single, unavoidable, trivial break, and it was well said by Mr. Justice Campbell, in The Magnolia and The Autocrat [Case No. 8,958], that "a party who has involved himself and others in peril cannot be heard to complain of their want of the clearest judgment in the selection of the modes of extrication."

If the tug Burke, in giving aid, was grossly careless, then a tort, a trespass, would have been committed, and the tug have been wholly responsible, if responsible at all. Yet the learned judge in the court below, blending a subsequent tort with a previous collision, has applied the division rule. It is respectfully submitted that the division rule cannot be applied to such a tort, a trespass, as it were, dehors the collision. The position the claimants take is, that for a tort occurring several hours after the collision, either the tug is answerable for all the damages or for none: in short, the common-law rule as to the measure of damages applies to such a tort as this, if tort there is. Again, if the tug is responsible for all the damage, yet on this appeal the tug can be held for no more than was decreed below, because the libellant has not appealed. 2 Pars. Shipp. 208, 209; The Stephen Morgan, 94 U. S. 599. But as the tug used due care, while the Alpine was guilty of negligence, the libel is to be dismissed. To have abandoned the Alpine when cognizant of her leaky condition, and with that full knowledge of the collision to which libellant's witnesses testify, was wanton and reckless conduct, and any damages then sustained which the captain and crew might have prevented (as by taking the Alpine to the dock or wharf, or by securing loose articles on deck,

for the night), cannot be recovered. Settled by The Baltimore, 8 Wall. [75 U. S.] 377, 387; The Thuringia, 41 L. J. Adm. 44; The Flying Fish, Brown. & L. 436; The Eolides, 3 Hagg. Adm. 367; The Columbus, 3 W. Rob. 159, 166; Tindall v. Bell, 11 Mees. & W. 232; Macl. Shipp. (2d Ed.) 299 (case of The Royal Oak); 2 Kay, Shipm. 926, 927; Boyd, Shipp. 260; 1 Pars. Shipp. 539. In fact, such was the condition of the Alpine after hanging three hours on the chain, that, had she cleared herself without any aid, she would, unless promptly cared for, have sunk in a short time; and this the libellant knew. The sinking was the ordinary natural sequence of the libellant's negligence. Whart. Neg. § 332. The settled rule in Massachusetts is stated in the leading case of Murphy v. Deane, 101 Mass. 455, 466, as follows, per Wells, J.: "Whenever there is negligence on the part of the plaintiff, contributing directly, or as a proximate cause, to the occurrence from which the injury arises, such negligence will prevent the plaintiff from recovery; and the burden is always upon the plaintiff to establish either that he himself was in the exercise of due care, or that the injury is in no degree attributable to any want of proper care on his part." So, too, Dickey v. Maine Tel. Co., 43 Me. 492, 496; Allyn v. Boston & A. R. Co., 105 Mass. 77, 78; 3 Kent, Comm. (12th Ed.) 232, note 1b. No want of care can be rightly charged to the tug.

Thus the reasons for dismissing the libel are: 1. From the negligence of her captain and crew the Alpine was at fault (as found by the court below) in getting foul of the powder-boat. Bailiffs of Romney Marsh v. Trinity House, L. R. 5 Exch. 208; Whart. Neg. § 123; The Louisiana, 3 Wall. [70 U. S.] 164. 2. The tug Burke, which appeared subsequent to the collision, did no harm except to the pawl-bitt, which is insignificant. Some force was necessary. Any loss beyond that of the pawl-bitt must be attributed exclusively to the negligence of the schooner, which she could easily have avoided. 3. The tug was employed to protect valuable property, and to prevent a possible calamity. She did not exceed her legal authority. The breaking of the pawl-bitt—a petty incident —was unavoidable, and was justifiable, and did not contribute to further damage. Almy v. Grinnell, 12 Metc. [Mass.] 53. 4. The proximate cause of the loss was the misconduct—the prolonged, the suspicious absence—of the captain and crew of the Alpine, and the Alpine is not shielded from her own wrong by proof of fault on the part of the tug, which had no connection with the proximate cause. The Carroll, 8 Wall. [75 U. S.] 302, 306; The Fairbanks, 9 Wall. [76 U. S.] 420, 425; The Fannie, 11 Wall. [78 U. S.] 238, 243; The Nichols, 7 Wall. [74 U. S.] 656, 666; The Continental, 14 Wall. [81 U. S.] 345, 355; 1 Pars. Shipp. 595. 5. The division rule has no application to such a case as this. 6. If the tug is to be held liable in such a case as this, it may put a premium on abandoning scows to be entangled in the shipping of Boston harbor. 7. The allegations in the libel are not sustained by the proof; they are strikingly at variance,— hence the libel must be dismissed. Rich v. Lambert, 12 How. [53 U. S.] 347, 356; Kramme v. The New England [Case No. 7,930]; Campbell v. The Uncle Sam [Id. 2,- 372]. 8. Mistakes made in moments of danger do not excuse the colliding vessel. Bentley v. Coyne, 4 Wall. [71 U. S.] 509, 512; The Jupiter [Case No. 7,585]; The Belle [Id. 1,269]; The Favorita [Id. 4,695].

CLIFFORD, Circuit Justice. Actions pending in a federal court, whether two or more, of like nature, or relative to the same question, may be consolidated if the court deems it reasonable, in order to avoid unnecessary costs, or to prevent delay. [Act of 1813] 3 Stat. 21; Rev. St. § 977; Conk. Pr. (4th Ed.) 363.

Two libels were filed in the district court by the libellant, as the owner of the schooner Alpine, one against the steam-tug Burke, and the other against the steam-tug Glide, each in a cause of collision, in which the libellant claimed damages for the destruction of the schooner, and for the loss of the stores, utensils, and working apparatus which she had on board at the time she sank.

Sufficient appears to show that the schooner was employed in freighting stone for the construction of the sea-wall in Boston harbor, and that prior to the collision, on the morning of the 16th of October, 1876, she had discharged her cargo and hauled out of the dock and come to anchor under the lee of the wall, leaving space enough to allow the next vessel in turn to pass into the vacated berth for the discharge of a similar cargo.

What the libellant alleges, in the case of the Burke, is that while the schooner was thus lying safely at anchor, the steam-tug. without authority, came alongside and made fast to the schooner, and commenced hauling upon her, and continued so to do, until by reason of the injuries so inflicted the schooner sank and became a total loss.

Service was made, and the owners of the steam-tug appeared and filed an answer denying the allegations of the libel. They also set up the defence that the steam-tug was sent to the schooner to remove her from fouling the powder-boat anchored in the harbor for the deposit and safe-keeping of powder; that the schooner was found caught between her rudder and stern-post by the cable or mooring-chain of the powder-boat which was kept moored there to receive deposits of powder manufactured by the powder company; and they also allege that the schooner had drifted from her anchorage while she was abandoned by her officers

and crew, and that she was without an anchor-watch, in violation of the city ordinance. Under those circumstances, the claimants admit that the steam-tug made fast to the schooner for the purpose of extricating the vessel from entanglement with the mooring-chain of the powder-boat, but they aver that the steam-tug used all due care and skill in her endeavors to accomplish that purpose; and they also allege that those in charge of the steam-tug were successful in relieving the schooner, and that they used no more force than the peculiar circumstances required.

Charges of a similar character are also made against the steam-tug Glide, to the effect following, that on the succeeding day she steamed up to the schooner and made fast to her without authority, and that she continued to haul upon the schooner until she broke her to pieces, rendering the vessel, her tackle, apparel, and furniture, valueless, and that she destroyed the stores, utensils, and working apparatus, which the schooner had on board at the time the alleged unlawful acts were committed.

Due service was also made in this suit, and the owners of the steam-tug appeared and filed an answer. They deny the alleged injuries to the schooner, but admit that the steam-tug went to the relief of the schooner to remove her from fouling the powder-boat moored in the harbor, and allege that the schooner was found on her beam-ends mostly under water, so near to the powder-boat that both vessels were in imminent danger; that the schooner was abandoned by her officers and crew, and that those in charge of the steam-tug used due care, skill, and precaution, in their endeavors to relieve the schooner, and that they succeeded in that behalf without doing serious injury to the vessel, or using more force than the circumstances required.

Both cases were heard together in the district court, and the court there entered a decree and order to the effect that both parties in each case were in fault, and that the damages sustained by the libellant in each case should be divided, sending both causes to a master to compute the amount. Prompt report was made by the master, to which the respondents excepted for the reasons stated in the record, but the court overruled the exceptions and entered a final decree in the case of the steam-tug Burke, that the libellant do recover the sum of $180.10 damages, and one-fourth of the aggregate of costs in the two cases, amounting to $84.27. Half damages were also recovered by the libellant in the case of the steam-tug Glide, and the court entered a decree in that case at the same time in favor of the libellant for the same amount of damages and costs as in the other case.

Seasonable appeal was taken by the respondents in each case to the circuit court. Separate hearings in the respective cases were granted here, but inasmuch as the two cases were heard together in the district court, and the exceptions to the master's report are joint, only one opinion will be given in the two appeals.

Beyond all doubt the two cases might have been consolidated, as the respective causes of action are of a like nature, and involve substantially the same questions, nor have the respondents any right to complain that the master embraced both cases in one report, as the record shows that they joined in their exceptions to the same, without making any objection, in the exceptions, that the two cases had not been separately considered by the master. Coming to the merits, the evidence shows to the satisfaction of the court that the schooner discharged her cargo as alleged in the respective libels, and that she came to anchor under the lee of the sea-wall, probably within the sweep of the mooring-chains attached to the powder-boat.

Prior to the collision, and during the forenoon of that day, the wind was from the northwest, blowing a fresh breeze, and the evidence is full to the point that the schooner became entangled in the mooring-chain of the powder-boat, or, in other words, the mooring-chain of the powder-boat got between the rudder and the stern-post of the schooner. Differences of opinion exist among the witnesses as to whether the schooner was, or was not, in much danger; nor is it of much importance to ascertain which of the two theories is correct, as all appear to concur that it was quite proper that the schooner should be extricated from her entanglement with the powder-boat's mooring-chain. When the collision occurred, neither the officers nor the men were on board the schooner, and she was without an anchor-watch on deck, but workmen employed there were in sight of the vessels, and one of them testifies that he instructed some of the men to get lines and go to her relief.

Suffice it to say, in this respect, that the evidence, taken as a whole, shows, beyond all reasonable doubt, that the charge of the libel in the case of the Burke is true; that she went alongside of the schooner, and made fast to her, without authority, and commenced hauling upon her while she was held by the mooring-chain of the powder-boat with which she was caught between her rudder and stern-post, as more fully explained in the record.

Entangled as the schooner was with the mooring-chain of the powder-boat, it was plainly a rash act to undertake to pull her clear of the mooring-chain by swinging her from starboard to port, as the attempt was made, as shown by the evidence. Difficult as the attempt was, still the proofs show that the effort was continued until it was accomplished, but that the schooner immediately sank. Considerable injury must have been

inflicted upon the schooner, as it appears, in extricating her from the mooring-chain, the steam-tug pulled out the dead-wood in the stern of the schooner, which in vessels of that construction is a part of the frame of the vessel. Vessels constructed in that way are unusually strong, as the dead-wood and cutwater are a part of the frame, so that when the dead-wood was pulled out it left a hole in the vessel which caused her to sink, lying on her beam ends, and with her masts to the southeast, the upper side of the vessel being just above the water.

Viewed in the light of the whole evidence, the district judge was of the opinion that both parties were in fault. That the schooner was in fault because she came to anchor too near to the powder-boat; and that the Burke was in fault because she was wanting in due care in her endeavors to extricate the schooner from her entanglement with the mooring-chains of the powder-boat, and I am of the opinion that the district judge was correct in both of these conclusions.

Whether any efforts were made by the Burke to raise or rescue the schooner from the place where she sank does not appear, but it does appear that she remained there until the following day, when the steam-tug Glide, without authority, made fast to her by a hawser for the purpose of removing her to some less exposed locality. Those in charge of the steam-tug made fast, in the first place, to one of the aft timber-heads of the schooner; but immediately when they got a strain on the sunken schooner the timber-head gave way, and then they made fast to the lower part of the mast. and hauled the wreck up on to the flats, where they left her in a damaged condition, with her sails loose and torn, her hatches gone, her mast damaged, her cabin furniture, stores, and outfit gone, as more fully set forth in the testimony.

Hearing was had in this case before the district judge at the same time the other case was heard, and he came to the conclusion that both parties were also at fault in this case, and I am clearly of the same opinion, and for the same reasons as those given in the case of the Burke.

Common prudence dictated that the schooner should not anchor within the sweep of the powder-boat's mooring-chain; and it is equally plain that the steam-tugs. if one or both volunteered the effort to extricate her, should use ordinary care and skill in any attempt they, or either of them, might make to accomplish that purpose. Much stress is laid upon the fact that neither the master nor crew of the schooner were on board at the time the respective tugs made fast to the schooner, but it is manifest that those in charge of the respective tugs knew well enough that the schooner was not abandoned, and that they could easily have found the master and crew or the owners of the schooner, if they had desired any information upon the subject.

Joint exceptions were filed by the claimants in the two cases to the report of the master in respect to the damages, to the effect following:—

1. That loss which could have been prevented by ordinary maritime skill and care on the part of the libellant and crew, after notice of the disaster, are not recoverable against the claimants.

2. That the evidence shows wanton and reckless neglect of plain duty on the part of the libellant and crew in omitting to care for the schooner during the rise and fall of two tides, after they had notice of the alleged wrongful acts of the two steam-tugs.

Argument to show that the schooner was in fault is unnecessary, nor are any authorities necessary in such a case to support the proposition that the libellant can only recover a moiety of the damages, however much the respondents may have violated maritime rules. Though in fault, the libellant may recover a moiety of the damage if the other party was also in fault; nor can the libellant here recover more than that, in any view, as he did not appeal from the decree of the district court, where the damages were divided between the parties.

Common-law authorities, which show that a plaintiff who is guilty of contributory negligence cannot recover compensation for injuries received are not applicable in the case, the rule being well settled in the admiralty court that where both parties are in fault the damage done to both vessels should be added together, and the combined amount should be. equally divided between the two. The Atlas, 93 U. S. 310; De Vaux v. Salvador, 4 Adol. & El. 431.

Loss which might reasonably have been prevented after notice of a collision, should not be allowed, but that rule is no answer to a claim for damages inflicted before the notice was given or received. Such an exception without any specification of the disputed items is hardly sufficient, but the decision is not placed upon that ground. Instead of that, the master's report has been examined, and it is not perceived that it furnishes any just pretext for the complaint involved in the second exception. The fact that the schooner was without an anchor-watch affords no defence to the claimants for the failure to exercise due care and skill in their efforts to extricate the schooner from the mooring-chain of the powder-boat. For these reasons I am of the opinion that the decision of the district judge in the two cases is in all respects correct, and that the respective decrees should be affirmed. Decree affirmed in each case, with costs.